IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| ENTERPRISE FINANCIAL GROUP, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| RICHARD PODHORN, an Individual; | § | |
| GR3 CONSTRUCTION, LLC; | § | |
| SLC GROUP, LLC; CLS GROUP, LLC; | § | |
| LCS GROUP, LLC; CORNERSTONE | § | |
| INVESTORS, LLC; WILMER FARMS, LLC; | § | |
| CAPDEV, LLC; HIGHLAND MANAGEMENT | § | |
| GROUP, LLC; MAUNDEIGH-BLU, L.P.; | § | CIVIL ACTION NO.: |
| MAUNDEIGH-BLU MANAGEMENT | § | |
| COMPANY, INC.; RICHARD J. PODHORN | § | JURY TRIAL DEMANDED |
| REVOCABLE TRUST U/T/A DATED | § | |
| MAY 18, 2006; CAPITAL CONSTRUCTORS | § | |
| DEVELOPMENT, LLC; | § | |
| LOCOMOTIVE INVESTMENTS, L.P.; | § | |
| HSWB, LLC; HS157, LLC; PFWB, LLC; WB1, | § | |
| LLC; 6ND, LLC; 6NWB, LLC; MISSOURI | § | |
| EQUITY SOLUTIONS, LLC; MO HOUSING | § | |
| & RE-DEVELOPMENT, LLC; CONTRACT | § | |
| HOLDINGS, INC.; SIMPSON LIVING | § | |
| TRUST; AUTOMOTIVE PROFESSIONAL | § | |
| RESOURCES, LLC; JCL REALTY LLC; and | § | |
| JAMES CAPITAL INVESMENTS, LP | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Plaintiff Enterprise Financial Group, Inc. ("EFG"), and for its complaint against Defendants alleges as follows:

## I.  PARTIES & SERVICE OF PROCESS

1.      Plaintiff EFG is a corporation organized and existing under the laws of the State of Texas, having its principal place of business at 122 W. Carpenter Freeway 6th Floor, Irving, Dallas County, Texas 75039, within the jurisdiction of this Court. EFG is a Texas resident for purposes of Civ. Prac. Rem. Code § 17.042.

2.      Defendant GR3 Construction, LLC ("GR3") is a Manager-managed Missouri limited liability company created on November 3, 2006. It may be served with process by serving its registered agent HSJ Agent Corp. at 120 S. Central Avenue, Suite 1500, St. Louis, Missouri 63105. GR3's principal place of business is listed at 120 S. Central Avenue, Suite 1500, St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, David F. Neiers of Sanberg Phoenix & von Gontard, P.C., counsel for GR3/Podhorn, organized GR3 and listed as his address 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105, the same address as initial registered agent HSJ Agent Corp. Upon information and belief, Defendant Podhorn, either individually, through an affiliate, or through Defendant Podhorn Trust, is the sole beneficial owner of GR3. Upon information and belief, GR3 is an entity with the sole purpose of fraudulently receiving moneys from NAVISS and funneling it to Podhorn or an affiliated entity and, as more fully set forth herein, should be disregarded.

3.      Defendant The CLS Group, LLC ("CLS") is an active Member-managed Missouri limited liability company formed on October 27, 2010. It may be served with process by serving its registered agent David Simpsons at 10176 Corporate Square Drive Suite 240B St. Louis, Missouri 63132. According to records maintained by the Missouri Secretary of State, David

1

Simpson ("Simpson"), Clayton Logomasini ("Logomasini"), and Jason Chrisco ("Chrisco") organized CLS, listing addresses at 15743 Country Ridge Drive, Chesterfield, Missouri 63017; 3525 Big Bear Court, Wentzville, Missouri 63385; and 5201 Shetland Drive, St. Charles, Missouri 63304, respectively.

4.      Defendant SLC Group, LLC ("SLC") is an inactive Delaware limited liability company formed on September 29, 2011 but not in good standing as of June 1, 2015. It may be served with process by serving its registered agent The Corporation Trust Company at the Corporation Trust Center 1209 Orange Street Wilmington, New Castle County, Delaware, 19801. Upon information and belief, SLC is one of the reinsurance entities used by NAVISS, GR3, and the Individual Defendants (as defined herein).

5.      Defendant LCS Group, LLC ("LCS") is a Delaware limited liability company. It may be served with process by serving its registered agent The Corporation Trust Company at the Corporation Trust Center 1209 Orange Street Wilmington, New Castle County, Delaware, 19801. Upon information and belief, LCS is one of the reinsurance entities used by NAVISS, GR3, and the Individual Defendants.

6.      Defendant James Capital Investments, L.P. ("JCI") is an active Missouri partnership formed on January 5, 2012. It may be served with process by serving its registered agent Scott H. Malin, Esq. at 7701 Forsyth Blvd., Suite 500 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, Defendant HMG is JCI's general partner. Logomasini signed as Manager of Defendant HMG, general partner of JCI and lists his address as 107 Rathfarnum Drive St. Charles, Missouri 63304.

7.      Defendant Highland Management Group, LLC ("HMG") is an active Missouri limited liability company formed on December 27, 2011. It may be served with process by serving

its registered agent Scott H. Malin, Esq. at 7701 Forsyth Blvd., Suite 500 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, Logomasini is the Manager of HMG.

8.     Defendant Locomotive Investments, L.P. ("Locomotive") is an active Missouri partnership formed on January 5, 2012. It may be served with process by serving its registered agent Scott H. Malin, Esq. at 7701 Forsyth Blvd., Suite 500 St. Louis, Missouri 63105.  According to records maintained by the Missouri Secretary of State, Defendant HMG is Locomotive's general partner.  Logomasini signed as Manager of Defendant HMG, general partner of JCI, and lists his address as 107 Rathfarnum Drive, St. Charles, Missouri 63304.

9.     Defendant Automotive Professional Resources, LLC ("APR," together with all other Defendants which are not the Individual Defendants, the "Corporate Defendants") is an Illinois limited liability company. It was involuntarily dissolved by the State of Illinois on September 11, 2015. It may be served with process by serving its former registered agent CT Corporation Systems at 208 S. LaSalle Street, Suite 814 Chicago, Illinois 60604. According to records maintained by the Illinois Secretary of State, Defendant Clayton Logomasini is listed as a Manager of APR.

10.     Defendant Maundeigh-Blu, L.P. ("Maundeigh") is an active Missouri limited partnership formed on August 20, 2012. It may be served with process by serving its registered agent Michael Kime at 165 N. Meramec Avenue, Suite 200 Clayton, Missouri 63105. According to records maintained by the Missouri Secretary of State, Defendant Maundeigh-Blu Management Company, Inc. is the general partner of Maundeigh. According to records maintained by the Missouri Secretary of State, Michael Kime organized Maundeigh and signed as a general partner.

11.     Defendant Maundeigh-Blu Management Company, Inc. ("MBMC") is an active Missouri corporation. It may be served with process by serving its registered agent Jill M. Cooper, CPA at 12101 Woodcrest Executive Drive St. Louis, Missouri 63141. As of November 30, 2015, its principal place of business is located at 2 Robert John's Way St. Charles, Missouri 63303. According to records maintained by the Missouri Secretary of State, Defendant Chrisco is the President, Secretary, and sole Director.

12.     Defendant Cornerstone Investors, LLC ("Cornerstone") is a Missouri limited liability company formed on July 17, 2013. It may be served with process by serving its registered agent Michael Kime at 165 N. Meramec Suite 200 Clayton, Missouri 63105.

13.     Defendant JCL Realty, LLC ("JCL") is an active Missouri limited liability company formed on February 19, 2011 and formerly known as "Summit Realty, LLC." It may be served with process by serving its registered agent Jason Chrisco at 3525 Big Bear Court Wentzville, Missouri 63385. According to records maintained by the Missouri Secretary of State, Defendant Chrisco and Logomasini organized JCL, listing addresses at 3525 Big Bear Court, Wentzville, Missouri 63385 and 107 Rathfarnum Drive St. Charles, Missouri 63304, respectively.

14.     Defendant Missouri Equity Solutions, LLC ("MES") is an active Missouri limited liability company formed on April 16, 2012. It may be served with process by serving its registered agent Ian C. Simmons at 3636 S. Geyer Road, Suite 100, St. Louis, Missouri 63127. According to records maintained by the Missouri Secretary of State, Jeffrey Garner is a Member as of February 8, 2016.

15.     Defendant MO Housing & Re-Development, LLC ("MHRD") is an active Missouri limited liability company formed on March 7, 2013. It may be served with process by serving its registered agent Ian C. Simmons at 3636 S. Geyer Road, Suite 100, St. Louis, Missouri

63127. According to records maintained by the Missouri Secretary of State, Jeffrey Garner is a Member as of March 1, 2016.

16.     Defendant Wilmer Farms, L.L.C. ("Wilmer Farms") is an active Missouri limited liability company formed on December 11, 2012. It may be served with process by serving its registered agent SPRA Corp. at 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105. Upon information and belief, Wilmer Farms owns the residence listed at 2112 Deborah Drive Punta Gorda, Florida 33950. According to records maintained by the Missouri Secretary of State, David F. Neiers of Sanberg Phoenix & von Gontard, P.C., counsel for GR3/Podhorn, organized Wilmer Farms and listed as his address 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105, the same address as initial registered agent HSJ Agent Corp. According to records maintained by the Missouri Secretary of State, Defendant Podhorn is the Manager of Wilmer Farms.

17.     Defendant CAPDEV, LLC ("CAPDEV") is an active Missouri limited liability company formed on August 10, 2012. It may be served with process by serving its registered agent SPRA Corp. at 120 S. Central Ave., Ste. 1420 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, David F. Neiers of Sanberg Phoenix & von Gontard, P.C., counsel for GR3/Podhorn, organized CAPDEV on behalf of HSJ Agent Corp. and listed as his address 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105, the same address as registered agent HSJ Agent Corp. According to records maintained by the Missouri Secretary of State, Defendant Podhorn is the Manager of CAPDEV.

18.     Defendant Capital Constructors Development, LLC ("CCD") is an active Missouri limited liability company formed on August 10, 2012. It may be served with process by serving its registered agent SPRA Corp. at 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105.

According to records maintained by the Missouri Secretary of State, Defendant Podhorn is the Manager as of July 1, 2016.

19.     Defendant Contract Holdings, Inc. ("Contract Holdings") is an active Missouri corporation formed on November 1, 2004. It may be served with process by serving its registered agent SPRA Corp. at 120 S. Central Ave., Ste. 1420 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, Defendant Podhorn is the President, Secretary, and sole Director of Contract Holdings as of January 13, 2015. According to records maintained by the Missouri Secretary of State, Contract Holdings' principal place of business is 829 Tall Cedar Court Wentzville, Missouri 63385. Upon information and belief, Defendant Podhorn owns the residence located at 829 Tall Cedar Court Wentzville, Missouri 63385.

20.     Defendant HSWB, LLC ("HSWB") is an active Missouri limited liability company formed on May 20, 2013. It may be served with process by serving its registered agent SPRA Corp. at 120 S. Central Ave., Ste. 1420 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, David F. Neiers of Sanberg Phoenix & von Gontard, P.C., counsel for GR3/Podhorn, organized HSWB and listed as his address 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105, the same address as registered agent HSJ Agent Corp. According to records maintained by the Missouri Secretary of State, Defendant Podhorn is the Manager of HSWB as of April 13, 2015.

21.     Defendant HS157, LLC ("HS157") is an active, Manager-managed Missouri limited liability company formed on March 10, 2014. It may be served with process by serving its registered agent HSJ Agent Corp. at 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, Defendant Podhorn organized HS157, listing his address as 829 Tall Cedar Court, Wentzville, Missouri 63385.

6

22.     Defendant PFWB, LLC ("PFWB") is an active, Manager-managed Missouri limited liability company formed on April 11, 2014. It may be served with process by serving its registered agent SPRA Corp. at 120 S. Central Ave., Ste. 1420 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, Defendant Podhorn organized PFWB, listing his address as 829 Tall Cedar Court, Wentzville, Missouri 63385. According to records maintained by the Missouri Secretary of State, Defendant Podhorn is the Manager of PFWB as of July 1, 2016.

23.     Defendant WB1, LLC ("WB1") is an active, Manager-managed Missouri limited liability company formed on April 11, 2014. It may be served with process by serving its registered agent HSJ Agent Corp. at 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, Defendant Podhorn organized WB1, listing his address as 829 Tall Cedar Court, Wentzville, Missouri 63385.

24.     Defendant 6ND, LLC ("6ND") is an active, Manager-managed Missouri limited liability company formed on January 16, 2014. It may be served with process by serving its registered agent HSJ Agent Corp. at 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105. According to records maintained by the Missouri Secretary of State, David F. Neiers of Sanberg Phoenix & von Gontard, P.C., counsel for GR3/Podhorn, organized 6ND and listed as his address 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105, the same address as registered agent HSJ Agent Corp.

25.     Defendant 6NWB, LLC ("6NWB") is an active, Manager-managed Missouri limited liability company formed on April 11, 2014. It may be served with process by serving its registered agent HSJ Agent Corp. at 120 S. Central Ave., Ste. 1500 St. Louis, Missouri 63105.

According to records maintained by the Missouri Secretary of State, Defendant Podhorn organized 6NWB, listing his address as 829 Tall Cedar Court, Wentzville, Missouri 63385.

26.     Defendant Simpson Living Trust (the "Simpson Trust"). Upon information and belief, Simpson is a trustee of the Simpson Living Trust. The Simpson Trust may be served with process by serving Defendant Simpson at the address listed herein.

27.     Defendant Richard J. Podhorn Revocable Trust U/T/A Dated May 18, 2006 (the "Podhorn Trust"). Upon information and belief, Defendant Podhorn is a trustee of the Podhorn Trust. The Podhorn Trust may be served with process by serving Defendant Podhorn at the address listed herein.

28.     Defendant Richard Podhorn is an individual residing in the State of Missouri. He may be served with process by serving him personally at 829 Tall Cedar Court Wentzville, Missouri 63385. Defendant Podhorn committed affirmative fraudulent actions in the State of Texas against EFG knowingly and willingly. Defendant Podhorn has previously contracted with Plaintiff EFG and EFG is to perform the contract in whole or in part in Texas.

## II.     JURISDICTION & VENUE

29.     This is an action by a Plaintiff against counterparties to several agreements and guarantors of those agreements for breach of contract, theft, conversion, breach of guaranty, fraud, conspiracy, piercing the corporate veil, constructive trust, single business enterprise claim, fraudulent transfers and other claims as necessary concerning debts owed and funds unlawfully transferred by the Defendants.

30.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between where there is complete diversity of citizenship between the

Plaintiff and all Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

31.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district, under 28 U.S.C. § 1391(b)(2), in that a substantial part of property that is the subject of the action is situated in this district and under 28 U.S.C. § 1391(b)(3), in that Richard Podhorn is subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

### III.     FACTUAL BACKGROUND

32.     EFG was founded more than 37 years ago by an established and nationally recognized auto dealer, Robert W. Moore. EFG administers a broad array of insurance-like consumer protection products, including extended vehicle service contracts, vehicle return programs, paint-less dent repair coverage, tire and wheel programs, and home warranties. EFG is probably most recognized for the award-winning Hyundai Assurance program, which provided consumer protection to more than one million customers.

33.     EFG sells its products in forty-nine (49) states through several distribution models: vehicle dealerships, OEMs and lenders, and direct-to-consumers through independent call centers.

34.     One entity that sold EFG products was North American Vehicle Insurance Services LLC, also known as "NAVISS." NAVISS was originally formed and owned by Clayton Logomasini, Jason Chrisco, David Simpson, and Defendants GR3 and Podhorn. Upon information and belief, despite not being signatory Members on the organizational documents, GR3 and Podhorn are Seventy-Nine point Eight Five percent (79.85%) owners of NAVISS, as reflected in NAVISS tax returns for 2011.

9

35.     In 2012 and 2013, NAVISS was a successful Seller of EFG's traditional vehicle service contracts ("VSCs").  In 2013, NAVISS produced just over 10,000 gross traditional VSCs.

36.     Between 2010 and 2015, unbeknownst to Plaintiff EFG, Logomasini, Chrisco, Simpson, and Defendants Podhorn, GR3, and the other Defendants participated in a fraudulent, concealed shell game/Ponzi scheme whereby they used a web of companies which were undercapitalized at the time of their formation to transfer funds from one company to another, reaping the financial benefits for themselves or their affiliates; to denude the coffers of these insolvent companies; and to close the doors of those companies to make it extremely difficult for Defendants' creditors to recover monies that the Defendants secretly absconded with. As a part of Defendants' plan, Defendants took on as much debt as possible to line their pockets with more cash to fund their personal obligations and ongoing real estate projects. Defendants used these borrowed moneys, debt proceeds, and newly-lined pockets to cover debts and obligations of these personal obligations and real estate projects. Defendants transferred cash and accounting records from company to company in order to conceal their scheme, often using the cash and receivables as collateral to take on more debt and two sets of accounting records to disguise this from creditors and potential lenders.

37.     EFG has sued NAVISS, Logomasini, Chrisco, and Simpson in Texas state court, in a case styled *Enterprise Financial Group, Inc. v. NAVISS, et al.*, Cause No. DC-15-00973, pending before the 44th Judicial District Court of Dallas County, Texas, the Honorable Judge Bonnie Lee Goldstein (the "Texas Action").  A copy of the complaint in that action is attached hereto as Exhibit A.

38.     The various entities involved in this case, including the corporate Defendants owned and controlled by Logomasini, Chrisco, Simpson, and Defendant Podhorn (hereinafter the

"Individual Owners") are shell entities used solely as cover to further the fraudulent enterprise. Thus, under Missouri law, the corporate form of the corporate Defendants should be disregarded and pierced and the Individual Owners should be found liable for the debts of the corporate Defendants for the following reasons:

A. the Individual Owners, jointly or individually, controlled the corporate Defendants, not by mere majority or complete stock control, but with complete domination, not only of finances, but of policy and business practices in respect the transactions at issue in this litigation so that the corporate entities as to the transactions had at the time no separate mind, will or existence of their own;

B. the Individual Owners, through some or all of the corporate Defendants, used their control of the corporate Defendants to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty or dishonest or unjust act in contravention of EFG's legal rights;

C. the control of the corporate Defendants and the breach of their legal duties proximately caused EFG injury and an unjust loss;

D. The Individual Owners used a web of companies as a sham to perpetuate a fraud;

E. The Individual Owners used the companies in their scheme as a device to defraud creditors by transferring assets of NAVISS, GR3, and other affiliated companies from one corporation to another or to the Individual Defendants when the corporations are owned by the same persons or entities;

F. The Individual Owners used a web of companies and its form to evade existing legal obligations to pay creditors and invade taxes;

G. The Individual Owners used a web of companies and its form to make transfers to benefit themselves in the form of distributions and loans which were fraudulent under the Missouri Uniform Fraudulent Transfer Act;

H. The Individual Owners stripped the assets of the Corporate Defendants to avoid and defraud creditors and Missouri residents;

I. The Individual Owners inadequately capitalized NAVISS and Defendant GR3, and the other corporate Defendants, in their scheme at the time of incorporation and while these companies were in business by denuding the coffers of these

11

companies through distributions and loans with the effect of keeping the companies' assets at a very small level in comparison to the known risks associated with the planned corporate enterprise; the Individual Owners made contractual promises without the present intent to perform which constituted misrepresentations sufficient to demonstrate fraud; and the Individual Owners caused their web of companies to be used for the purpose of perpetrating an actual fraud and perpetuated an actual fraud on EFG primarily for the Individual Owners direct personal benefit.

39.     Upon information and belief, to conceal their cash addiction, the Individual Owners used additional strategies other than the multiple strategies set forth above, including, without limitation:

A.  Keeping multiple sets of "books" and accounting records;

B.  Changing entity names, frequently and without justification, sometimes simply swapping their personal initials;

C.  Using a web of fraudulent loan transactions and partner distributions between themselves and their many entities in order to keep track of the "real" outstanding balance;

D.  Making and accounting for "ownership distributions" to certain partners (including Defendants Podhorn and GR3), but removing or excluding those partners from the ownership or operating documents and paper trail; and

E.  Making and entering into "cash allocation" agreements between Defendant Podhorn, Logomasini, Chrisco, and Simpson whereby they agreed that Defendants GR3 and Podhorn and/or other related entities, including the corporate Defendants, would receive minimum guaranteed cash allocations from NAVISS, and Defendants GR3, APR, CLS, and the Individual Owners in exchange for "investment capital" and interests in other projects. In reality, Defendants GR3 and Podhorn were actually owners of NAVISS, but references to them being owners were excluded from any operating documents, state filings, or corporate records.

40.     In order to fund their cash addiction, the Individual Owners utilized familiar concealment strategies in a never-ending cycle:

A. First, the Individual Owners would pledge cash in order to collateralize additional debt from different creditors. The multiple books, name changes, transfers of cash, and under-the-table distribution/allocation agreements helped them pledge cash accounts in exchange for quickly-made loans.

B. Second, once the Individual Owners received the proceeds of the loan (collateralized by cash), the Individual Owners would invest in a company or project (real estate projects, for example);

C. Third, after commencing (or continuing, in the case of a capital call) the company or real estate project, the Individual Owners would substitute their cash collateral pledge for the assets of the company or real estate project (receivables or real estate);

D. Fourth, the Individual Owners would transfer the cash to themselves or their affiliate entities and restart the process. In addition to the loans and ownership distributions, the Individual Owners withheld payment of customer cancellations so that their call center business would keep distributing cash to pay for their personal and affiliates' debts and obligations. For example, Logomasini instructed an accounting manager to not pay any customer cancellation/refund unless previous approved by Logomasini. The account manager felt uncomfortable with this practice and, to protect herself, she identified cancellations which she caused to be forwarded to Logomasini. They had been marked "STC," code for "Sent To Clayton."

41.     As a part of their scheme, the Individual Owners entered into various loan agreements with finance companies, including, without limitation, Omnisure Group, LLC ("Omnisure"), TransNational Payments ("TransNational"), PayLink, Credit Cash, and U.S. Cash, to suck out as much money as they could. These loan agreements were done without EFG's knowledge or consent.

42.     Relying upon the large amount of revenue from 2012, the Individual Owners convinced PayLink to only retain $75 per contract and to pay the Individual Owners a much larger commission up-front. The Individual Owners greatly increased the risk that *someone* would have to pay out-of-pocket to make customers whole according to their contracts. Because the Individual

Owners went out of business and refused to honor their contractual commitments, EFG was left on the hook for all customer cancellation payments. This deceptive trade practice greatly increased EFG's financial exposure to future customer cancellations. The Individual Owners' refusal and nonpayment have actually caused EFG to pay customer cancellations in an amount in excess of $6,000,000. This reserve adjustment was done without EFG's knowledge or consent.

43.    Upon and information and belief, Defendant Podhorn and the network of corporate Defendants were involved in all of these actions. Upon information and belief Defendants Podhorn and GR3 were not placed on the NAVISS's or the Individual Owners' ownership statements to avoid disclosure of Defendant Podhorn's 2010 personal bankruptcy filing. This deception is consistent with the Individual Owners' fraudulent transfer practice of moving security or collateral pledged for a loan or a debt to another entity when they believed that litigation was oncoming.

44.    The Individual Owners accomplished the transfer of funds by wire, check, or withdrawal from their many accounts to others, and accounted for them as loans or partnership distributions in order to avoid creditor and regulatory scrutiny and tax liability. As a part of this scheme, Defendants have held at least one account overseas.

45.    Upon information and belief, the Individual Owners took these actions knowingly, willfully, and fraudulently to fund their scheme. Upon information and belief, Logomasini learned these practices during his time at U.S. Fidelis, before the lawsuits, investigation, judgments, and prison sentences for Fidelis owners/executives.

46.    This behavior is the definition of a Ponzi scheme: use cash, revenue, or assets to collateralize debt or entice investors, then use those funds to cover other losses, personal interests, or companies. In short, the Individual Owners, aided by Defendants, fraudulently procured funds for one stated purpose, only to use them for another purpose and to benefit themselves. As

14

described herein, all Defendants, as an enterprise, participated in a scheme which constitutes a pattern of fraudulent activity, including fraud, embezzlement, theft, and money laundering.

47.     This suit seeks, *inter alia*, to recover damages proximately caused by Defendants' conduct.

## IV.    CAUSES OF ACTION

**Count 1:   Fraudulent Transfer under Chapter 24 of the Texas Business and Commerce Code and Transfers Fraudulent To Present And Future Creditors Under RSMo. § 428.028 – Against All Defendants**

48.     Plaintiff EFG re-alleges and incorporates by reference each and every allegation set forth above.

49.     On March 10, 2009, the Individual Owners (including Defendant Podhorn) formed Global Coalition Services, Inc. ("Global") in the State of Missouri. Prior to its administrative dissolution, Global's primary business was to sell, underwrite, and administer motor vehicle extended service contracts or "vehicle protection plans" to cover the cost of maintenance and repairs to a vehicle beyond the manufacturer's warranty. The plan was to market the vehicle protection plans to customers throughout the United States (where not precluded from doing so under the name "NAVISS". *See* Second Amended Complaint filed in *Jay Gill v. David Simpson, NAVISS, LLC, Jason Chrisco, Clayton Logomasini, and Global Coalition Services, LLC* originally filed May 2, 2012, United States District Court for the Eastern District of Missouri, Eastern Division, Case No. 4:12-cv-01851-5 PM, at 1 (the "Gill Complaint").

50.     In consideration for several investors' agreement to provide seed money and additional funding, Global provided such investors shares of stock in Global, including:

> A.  Name: Jay Gill
> Promissory Note Dated: 12/4/09

Principal: $100,000
12% Interest: $12,000
Terms of Promissory Note: 12 Months

B.  Name: Thomas H. Schindler and Lisa M. Schindler
Agreement Signed: 11/30/09
Promissory Note Dated: 12/7/09
Principal: $50,000
12% Interest: $6,000
Total Due: $56,000
Terms of Promissory Note: 12 Months

C.  Name: Parmeet S. Matharu
Agreement Signed: 10/16/09
Promissory Note Dated: 12/7/09
Principal: $100,000
12% Interest: $12,000
Total Due: $112,000
Terms of Promissory Note: 12 Months

D.  Name: Avion Solutions, Inc. (Gary and Chad Donald)
Agreement Signed: 11/30/09
Promissory Note: $100,000
12% Interest: $12,000
Total Due: $112,000
Terms of Promissory Note: 12 Months

E.  Name: Thomas J. Klepzig
Agreement Signed: 1/31/10
Principal: $50,000
12% Interest: $6,000
Total Due: $56,000
Terms of Promissory Note: 12 Months

The total amount funded by the investors was $448,000. This amount was not repaid on their due

dates. *See* Email from S. Stapleton to J. Gill dated January 10, 2011.

51.     On August 9, 2009, Global registered the fictitious name North American

Insurance Services (the acronym of which is "NAVISS") with the State of Missouri (the "Global-

NAVISS" 1st Fictitious Name Filing").

52.     On November 10, 2009, Global registered the fictitious name North American Vehicle Insurance Service Specialists (the acronym of which is NAVISS) with the State of Missouri, Global was listed as the 100% owner of this name (the "Global-NAVISS 2nd Fictitious Name Filing. See id at 29.

53.     On December 10, 2009, Simpson and, upon information and belief Chrisco, authorized and directed the formation and registration of a new Missouri limited liability company, North American Vehicle Service Specialists, taking the identical name registered, used, and owned by Global.

54.     North American Vehicle Insurance Service Specialists (acronym "NAVISS") was designed to perform the identical business of Global – to sell, underwrite, and administer extended vehicle service contracts under the name "NAVISS."

55.     On February 6, 2010, Simpson - and, upon information and belief, Chrisco authorized and directed the filing of an amendment to the Articles of Organization to change the name of North American Vehicle Insurance Service Specialists, LLC to NAVISS, LLC, taking the identical name registered, used and owned by Global.

56.     Simpson assured Gill and the other Global shareholders that as soon as NAVISS was wrapped up and off the ground, Simpson and/or NAVISS would make sure that Global shareholders retained the identical ownership interest in NAVISS that they had in Global. *See* Gill Complaint at 31.

57.     Despite continuing to communicate with Gill periodically and act as if he was his partner and co-owner in NAVISS, and continuing to solicit Gill's business knowledge and advice with respect to same, Simpson failed to list or include Gill (or the other shareholder) as an owner of NAVISS. Further, Simpson, and NAVISS, upon information and belief, distributed a significant

portion of NAVISS's profits – profits that properly belonged to Global – to Simpson, Chrisco, and Logomasini, to the detriment and exclusion of Gill and the other Global shareholders. *See* Gill Complaint at 32.

58.     Thus, not only have Simpson and NAVISS (and other members of NAVISS) failed to provide Gill the same percentage in NAVISS that Gill holds in Global, but they have failed to provide Gill with any interest in NAVISS.

59.     In March 2010, Simpson, as CEO of Global, transferred cash and funds from Global to NAVISS in the amount of at least $269,877.30 in the form of a loan, which was without collateral.

60.     In October 2010, Simpson, acting as CEO of both companies, assigned Global's registered trademark "AND NOW YOU'RE COVERED" to NAVISS. *See* Trademark Assignment between Global and NAVISS dated October 13, 2010 (the "Global-NAVISS Trademark Assignment").

61.     The assignment of Global's trademark was made without the knowledge, consultation, or approval of Gill, Global's Board of Directors, or Global's shareholders (other than Simpson and, upon information and belief, Chrisco), and contained no consideration.

62.     Simpson created Global's website for Global. The website was owned by Global and initially paid-for using Global funds. The website was designed to market the vehicle protection business. Simpson, as CEO for Global, transferred Global's website to NAVISS for no consideration.

63.     Upon information and belief, Simpson, Logomasini, Chrisco, and Defendant Podhorn orchestrated a transfer of all or substantially all of the assets of Global to NAVISS as the

beginning of a continuous Ponzi scheme that, upon information and belief, continues to the present.

64.    The transfers of Global's trademark registrations, website, and over $269,000 in cash were not carried out in the ordinary course of Global's business and Board of Director approval was never secured.

65.    Simpson, Chrisco, Logomasini, and Defendant Podhorn engaged in fraud and fraudulent transfers under Missouri law by conspiring to create a separate LLC to compete in direct conflict with Global's business, transferring valuable assets from Global and from NAVISS to themselves and/or affiliated entities with the intent not to pay creditors at a time when NAVISS was insolvent.

66.    As stated above, NAVISS and its principals failed to pay back the original investors of Global when the outstanding promissory notes became due. *See* Email from Pam Matharu to David Simpson and J. Gill dated March 3, 2011. In defense of their fraudulent conduct and their failure to pay the corporate debts on time, they made several arguments/excuses that actually support Plaintiff's fraudulent transfer claim:

  A.  On February 3, 2011, Simpson sent Global's investors a copy of the proposed legislation (MO S. 132) and the Missouri Attorney General's report explaining if the legislation is enact, the business of selling vehicle service contracts would be devastated and it would basically put NAVISS out of business.

  B.  On February 17, 2011, Simpson apologized for the delay in responding to Jay Gill, one of Global / NAVISS's original investors, but stated that a lot of other bad things are happening:

      "An administrator that Global/NAVISS were using (Administrator Plus) had their insurance company (Western Insurance) go out of

business. That let us (NAVISS) holding the bag on $4,000,000.00 + of claim money that they took and no one could find. Needless to say we are frantic as that means that we (NAVISS) now have to cover claims with our own money since the insurance company doesn't have the money. Also, the Department of Insurance in Utah (where Western Insurance Company was domiciled) is about to make us notify the customers that they can cancel the policies. This would be a huge disaster since we would have to continue paying claims, and also refund money on a HUGE amount of contracts. We are trying to work out a deal with another administrator and our finance company, or we will be screwed."

C. "On top of that the new insurance law (requiring ALL of our employees to have an insurance license to sell warranties) goes into effect on January 1, 2012. We are worried about the number of sales reps that COULDN'T pass the exam, meaning they can't work."

D. "We have currently millions of dollars in policies that we have personally guaranteed, so we are still going on and trying to figure a way to get this sold so we don't get screwed."

67.     On February 17, 2012, Simpson notified the original investors of Global that NAVISS would be issuing K-1's for the interest distribution on the promissory notes that were paid back, but Simpson explained the delay with more troubling news on the insolvency of NAVISS:

"The reason it is taking a little bit for the GSCI K-1's is because NAVISS is trying to get the books redone. The IRS is saying that NAVISS owes taxes on the reserve money that was never received, thereby making the tax liability actually more than the net income received in 2011. You guys don't have to worry about that since you owned GCSI shares not NAVISS shares, but it is something I have to get fixed or I owe the IRS 2+ million dollars. Please be patient with us."

68.    In an email from Simpson to Logomasini dated February 27, 2011 attaching 2011 Balance Sheet and Income Statement we see that the dire financial state of NAVISS was consistent with the 2011 NAVISS Financial Statements, which showed a negative total equity of $74,654.92.

69.    Although Simpson was accurately informing the Global Investors that NAVISS was insolvent in 2011, NAVISS and its principals were still not disclosing to Global's investors all of the fraudulent acts that Defendants undertook once NAVISS became insolvent in 2010 and 2011.

70.    Indeed, on October 27, 2009, Simpson, Logomasini, and Chrisco started the CLS Group, LLC in the State of Missouri. This entity was used by Simpson, Logomasini, and Chrisco to enter into written agreements with administrators, including EFG, in order to receive monetary benefits in the form of overfund commissions and/or production bonuses which these individual defendants intended to keep for themselves and not share with their Global investors / partners – which included the Plaintiffs in the Gill Complaint, EBC Solutions, and Avion Solutions.

71.    Upon information and belief, Simpson, Logomasini, Chrisco, and Defendant Podhorn continued this scheme by not disclosing that NAVISS had not been maintaining any reserves to ensure that NAVISS could pay back any refund amounts it owed from the cancellation of vehicle service contracts by consumers.

72.    In an email from J. Saleeby to Logomasini dated May 4, 2013 is an attachment prepared NAVISS's attorney containing an executive summary in 2013 that the NAVISS principals could use to obtain additional funds from various lenders. In that executive summary, attorneys for NAVISS admitted that call centers are required under controlling law to maintain adequate cash reserves:

> "Because the contracts are cancellable over an extended time period, issuers and
> sales agents for these contracts are required to retain adequate case reserves to repay

unused premium and initial payments to customers who cancel their policies. Failure to maintain adequate reserves can subject the business and its owners to criminal and civil charges and fees that can be extensive."

73.    One March 20, 2012, PayLink, a finance company, sent a NAVISS claims loss/ration report as of 1/31/12. The PayLink report showed that the NAVISS contracts (which includes all contracts not just PayLink funded contracts) is running at 7.00% – 8.31% loss ratio and as it stood today, the excess cash needs will be $786,107.08. *See id.*

74.    NAVISS, Simpson, Logomasini, Chrisco and Defendants GR3 and Podhorn also did not disclose to their Global investors/partners that the dire financial condition was, in fact, worsened as a result Defendants' decision to continue their Ponzi scheme by creating and using new or additional corporate entities and by back-dating written agreements to drain the coffers of NAVISS, to avoid paying creditors, and to fund their real estate projects.

75.    NAVISS and its Owners knew that under their interpretation of controlling law, the administrator, such as Enterprise, would be ultimately responsible to refund all refund owed to customers as a result of early cancellations; as a result, Defendants hatched and implemented their plan to siphon as much money as they could from their vehicle service centers through many corporate entities and many bank accounts. Once the vehicle service entities' coffers had been emptied into their own pockets and into real estate projects, Defendants would merely close the doors of the vehicle service entities and merely walk across the street to continue their real estate projects that were entirely funded by the vehicle service entities.

76.    Despite staring down the barrel of insolvency and bankruptcy for NAVISS and personal liability for failing to keep adequate reserves, NAVISS and its Owners paid themselves millions of dollars in distributions, loans, and salary. *See, e.g.*, Email from S. Brown to C. Logomasini dated April 23, 2014, attaching a detailed breakdown of the millions of dollars in

distributions, loans, and wages flowing to the NAVISS owners from NAVISS, Automobile Professional Resources, LLC and the CLS Group, LLC.

77.     This accounting analysis alone shows that over $18 Million went to Simpson, Logomasini, Chrisco, and GR3/Podhorn, even though Simpson was informing the Global investors / partners that NAVISS was on the verge of bankruptcy as a result to the Western Insurance Group collapse, potential enactment of new Missouri legislation and an IRS audit.

78.     To make it more difficult for creditors to reach Defendants' assets specifically real estate, Logomasini and Chrisco created new entities in 2012. On January 5, 2012, Logomasini created both James Capital Investments, L.P. ("James Capital") and Locomotive Investments, L.P. in the State of Missouri.

79.     Likewise, Chrisco formed and/or used another entity, Maundeigh-Blu, L.P. ("Maundeigh") in the State of Missouri in 2012.

80.     Shortly thereafter, on February 28, 2012, Defendants Simpson, Logomasini, Chrisco and GR3/Podhorn created Defendant APR in the State of Illinois.

81.     APR was owned by the Simpson Living Trust, James Capital, Maundeigh-Blu, and GR3/Podhorn.

82.     Using an intricate web of companies, including NAVISS, CLS, APR, James Capital, Maundeigh-Blu, and GR3/Podhorn and multiple bank accounts, the individual Defendants used monies of NAVISS, CLS, and APR to siphon off all monies from these entities to favor certain creditors and pay off others; to fraudulently purchase vacant commercial real estate, wholesale properties and 42 low income rental properties with the intent to avoid paying the creditors of NAVISS, CLS, and APR and to fraudulently inject capital into the real estate projects again to avoid paying the creditors of NAVISS, CLS, and APR.

83.     In an email from S. Mastin to D. Neiers dated April 10, 2012, Steve Mastin, NAVISS's Chief Financial Officer told Richard Podhorn's attorney, David Neiers the "deal:"

> "Here's the deal: Already purchased with cash - 7 residential units in the new town development; cost was $48,500 each. Comps earlier this year show $68,000 to $69,000 on each unit or a total value of $483,000. What he would like is an 80% L+V for approximately $386,400.

84.     In another email, Tim Schuur of Cornerstone Dealer Services, a wholly-owned affiliate Warranty Consultants, boasted to John Saleeby, former owner of NAVISS, that "maybe our NEXT building…."

85.     The funding of Defendants real estate projects started with NAVISS, CLS, and APR with cash from those companies flowing through Logomasini, Locomotive Investments, Chrisco, Maundeigh-Blu, GR3/Podhorn, JCL Realty, LLC, Missouri Equity Solutions, LP, Wilmer Farms, LLC, CAP Dev, LLC, and ultimately to the single-asset entities that own the real estate, including the building built on the properties. Those single asset entities included the following:

      A.  HSWB, LLC – Wentzville Bluffs' Hot Shots Bar & Grill

      B.  HS157, LLC – Edwardsville Hot Shots Bar & Grill

      C.  PFWB, LLC – Wentzville Bluffs' Planet Fitness

      D.  6ND, LLC – 6ND Commercial Property

      E.  WB1 – Wentzville Cinema

86.     By way of an example, when NAVISS was an unstable, failing house of cards, Logomasini signed a Contract For Sale of Real Estate to purchase a $1.9 Million, 20-acre, partially-developed piece of property known as "Wentzville Bluffs" off Highway Z in Wentzville, Missouri. The purchase of the property came with millions of dollars in tax credits.

87.     To purchase the $1.9M property from Great Southern Bank, Logomasini delivered a letter stating that the accounts of NAVISS and Locomotive Investments have total assets in excess of $1.9 Million.

88.     To fund the closing, Logomasini, through NAVISS and Locomotive Investments, deposited $950,000 in to a Bank of Washington Account ("BOW") in the name of JCL Realty, LLC. Likewise, Chrisco, through NAVISS and Maundeigh-Blu deposited $950,000 into JCL Realty BOW account.

89.     A $1.9M certificate of deposit, in the name of JCL Realty, LLC (owned by James Capital and Maundeigh-Blu), was put up as collateral for the three loans made by BOW to CapDev, LLC along with 23.82 acres at the corner of State Highway Z and Interstate 70 commonly known as Wentzville Bluffs and an assignment of the principal and interest of the Community District Notes (currently $3.7M).

90.     A $1.9M loan to CapDev for the initial land purchase and phased development was funded as follows:

   A.  Phase 1 – Hot Shots $537,176.20;

   B.  Phase 2 – Xist Fitness $426,387.50; and

   C.  Phase 3 - $224,273.50.

   D.  HSWB, LLC (a single purpose entity wholly owned by Cap Dev, LLC holding Hot Shots is requesting a loan of AMOUNT

   E.  XFWB, LLC (a single purpose LLC wholly owned by Cap Dev, LLC holding Xist Fitness) is requesting a loan of $3,945,973 for Xist Fitness.

To make the tracking of NAVISS's $1.9M more difficult, Defendants switched these loans from BOW to CNB Bank with the loans ultimately resting with Eagle Bank. Also, Defendants moved Hot Shots from Logomasini, to CapDev, LLLC to HSWB, LLC.

91.     To obtain financing from Eagle Bank, JCL Realty subsequently agreed that it would inject $1,854,000 which as being pledged as additional collateral to loans to CapDev, LLC and PFWB, LLC, in cash equity into the Wentzville Cinema Company project. The $1,854,000 cash equity was, in fact, injected into the Wentzville Cinema project.

92.     In the end, the Individual Owners, including Defendant Podhorn used funds primarily belonging to NAVISS and some funds belonging to APR and NAVISS to fund the land purchase and development of the Wentzville Cinema, the Wentzville Planet Fitness and the Wentzville Hot Shots at the time when those call center entities were insolvent.

93.     A second example of the Individual Owners, including Defendant Podhorn, fraudulently transferring funds primarily belonging to NAVISS, CLS, and APR to fund the purchase of property can be found by zoning in on Wilmer Farms, LLC.

94.     Wilmer Farms, LLC is owned by Richard Podhorn or his Living Trust and James Capital.

95.     Logomasini commingled funds of NAVISS with funds belonging to Wilmer Farms, LLC.

96.     In December 2012, Wilmer Farms, LLC purchased real estate located at 1221 Pinewood Drive, St. Charles, MO 63385 in the amount of $476,340.08.

97.     To purchase this property, Logomasini fraudulently transferred his share of the purchase price ($238,500.00) from NAVISS through Logomasini's two personal accounts at US Bank and ultimately to Wilmer Farms, LLC's PrivateBank Account.

98.    To purchase this property, Logomasini and GR3/Podhorn fraudulently transferred Podhorn's share of the purchase price ($238,500.00) from NAVISS to GR3 through GR3's PrivateBank account and ultimately to Wilmer Farms, LLC.

99.    The transfers from NAVISS to Wilmer Farms, LLC were fraudulent under the Missouri Uniform Fraudulent Transfer Act for several reasons:

    A.  NAVISS, CLS, and APR were inadequately capitalized;

    B.  the transfers made by the Individual Defendants to purchase real estate were made with the intent to defraud creditors of NAVISS, CLS, and APR; and

    C.  were made at a time when those companies were insolvent.

100.    Defendants undoubtedly will try to claim that in 2012 and the first half of 2013, NAVISS earned income exceeding $67,153,447.34 and $21,561,266.26, respectively. This claim should not even get out of the starting gate for several reasons:

    A.  The Individual Defendants were keeping two sets of books for NAVISS. *Compare* NAVISS Balance Sheet as of December 31, *with* NAVISS Balance Sheet as of December 31, 2012.

    B.  In the first half of 2013, NAVISS had a net income of –$977,198.60.

    C.  The 2012 and 2013 NAVISS Financial Statements do not accurately reflect the Non-recurring Extraordinary Items / Liabilities of NAVISS contained on the Non-recurring Extraordinary Items prepared by J. Saleeby. If NAVISS and its Owners accurately incorporated these Extraordinary Items / Liabilities into their financial statement, it could not be legitimately argued that NAVISS was solvent.

27

D. As a part of a tax fraud scheme, Defendants were back-dating written agreements to unsuccessfully attempt to legitimize very large fraudulent transfers from NAVISS to NAVISS Owners (Logomasini, Chrisco, Simpson, and GR3/Podhorn) in 2011, 2012, and 2013. Upon information and belief, NAVISS back-dated these agreements to avoid paying penalties and interest on taxes owed by Podhorn as a part of Defendants' fraudulent tax scheme. Defendants have not produced emails which would show the date(s) on which these written agreements were actually signed. Regardless, even if the back-dated written agreements are valid, the huge distributions, loans and transfers to the Individual Defendants in 2011, 2012, and 2013 were fraudulent under the Missouri Uniform Fraudulent Transfer because, *inter alia*:

    i. the payments were made to defraud NAVISS Creditors;

    ii. the payments were made without receiving a reasonably equivalent value in exchange for the transfer or obligation and NAVISS

        1. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        2. intended to incur or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

101.   As previously stated, NAVISS and its Owners were not keeping an accurate set of books. For example, the amount of monies paid to Logomasini, Chrisco, Simpson, and

GR3/Podhorn listed on the 2012 Company K-1 does not match the amount of distributions listed in NAVISS's 2012 Balance Sheet.

102.    Having been informed that NAVISS was facing an excess cash need between $800,000 and $1,200,000 by July 2012 and knowing that NAVISS was projected to lose $9 million over the next five years, the NAVISS Owners prepared fraudulent projections and committed securities fraud by submitting those fraudulent projections to various lenders to obtain funding in a desperate effort to keep NAVISS's house of cards from falling for a little longer. NAVISS's Owners needed enough financing and time to siphon off all of the coffers of NAVISS, CLS, and APR into their real estate enterprise.

103.    NAVISS was involved in multiple lawsuits in 2012 field by various state Attorneys General and by the Global investors/partners. NAVISS spent a large amount of money on Aegis (its attorneys) to defend these suits.

104.    NAVISS, Stacy Brown, J. Saleeby of Morgan Stanley, and Logomasini were involved in unlawful activities that were untaken for the benefit of NAVISS and its Owners. Upon information and belief, Stacey Brown forged a signature on behalf of NAVISS and Logomasini to perpetuate their scheme. Kelsey Cissna picked up on Logomasini's criminal conduct and resigned on January 13, 2015, just days before Plaintiff filed its Original Complaint.

105.    Knowing that NAVISS's house of cards was about to fall, and that they would be facing personal liability in excess of over $2 million, Defendants actively had their attorneys take steps to protect their personal assets in anticipation of lawsuits in the future. Defendants have a practice of hiding or moving assets when their companies start to fail.

106.    Turning back to the fraudulent transfers of funds by the Individual Defendants from NAVISS, CLS, and APR in 2011, 2012, and 2013 to fund the purchase of real estate and the

construction of real estate projects owned by affiliates of the Individual Defendants, Defendants fraudulently transferred monies of NAVISS, CLS, and APR to fund real estate properties held by Missouri Equity Solutions, LLC and HS157, LLC.

107.    On April 16, 2012, Logomasini formed Missouri Equity Solutions, LLC in the State of Missouri. Missouri Equity Solutions, LLC are owned by James Capital, JGM Properties, LLC, and JCF Properties, LLC.

108.    Upon information and belief, Logomasini purchased at least 45 properties for Missouri Equity Solutions, LLC between 2002 and 2015 using funds that were fraudulently transferred by Logomasini from NAVISS, CLS, and APR to Locomotive Investments.

109.    Upon information and belief, Logomasini fraudulently transferred monies from NAVISS, CLS, and APR to Locomotive Investments or his Logomasini's personal U.S. Bank account at U.S. Bank and then purchased the 45 properties with those fraudulently transferred funds.

110.    At one point, an accountant for the Corporate Defendants even admitted that she was having trouble tracing where some of the money has come from and gone at closings.

111.    On a final note, upon information and belief, Logomasini, Chrisco, Simpson, and GR3/Podhorn fraudulently transferred monies from NAVISS, CLS, and APR in the amount of $1,554,101.82 to close the Hot Shots Edwardsville on May 8, 2014. Hotshots Edwardsville is owned by the single asset entity by the name of HS157, LLC.

112.    In summary, EFG has been damaged in excess of $6 Million, the refund amount that NAVISS was obligated to pay by contract and by statute from early cancellations of vehicle service contracts sold to consumers. Instead of paying their portion of the refunds and cancellation

fees the Individual Defendants fraudulently raided the coffers of NAVISS, CLS, and APR to line their own pockets and to fund real estate purchases and projects.

113.    Under Enterprise Financial Group, Inc. Seller Agreement dated January 25, 2010, NAVISS represented and agreed that all amounts of the Seller Cost which are received by the Seller from the same of vehicle service contracts shall be held in trust by NAVISS for the benefit of EFG and the insurance company and should be promptly paid over to EFG. Additionally, under the Seller Agreement, NAVISS represented and agreed that if EFG pays NAVISS an amount representing a pro rata portion of the Seller Cost relating to a cancelled vehicle service contract, NAVISS would be solely responsible for remitting full payment of any cancellation refund to the purchaser of the cancelled contract.

114.    Under Section 13 of the M2M Addendum No. 2, NAVISS agreed that EFG would retain a reserves equal to 35% of the Seller's advance for the repayment of obligations of EFG for advances from Omnisure in excess of the Seller's commission advance (the "Reserves"). *See* M2M Addendum No. 2 at ¶13, 2. NAVISS also agreed that EFG would retain the reserves and pay charges in excess of the Seller's advances from the reserve; that EFG would provide reporting to the Seller, as needed and that both parties agree that the reserve may be adjusted (higher or lower) once cancellations can be projected for future obligations; that any remaining funds, after disbursement of all charges and fees will be for the benefit of the Seller; and, most importantly, prior to the disbursement of the remaining unused holdback reserves EFG reserves the authority to deduct from the remaining unused holdback reserves any amounts owed by Seller as it relates to EFG programs utilized by Seller. *See id*.

115.    As additional consideration for the Payment Advances from EFG for business placed by NAVISS in the M2M Program, NAVISS and Seller's Owners (Logomasini, Chrisco,

and Simpson) as guarantors did "jointly and severally promise to repay ALL unearned payment advances and amounts owed to EFG in the event of early cancellation by any customer" and they agreed that the cancellation of the Addendum No. 2 or the Seller Agreement for Administrative Services did not alter the obligations of NAVISS for repayment to EFG. *See* M2M Addendum No. 2 at ¶ 14, 2.

116.    At no time did Defendants inform Plaintiff EFG that Defendants had not properly reserved for the vehicle service contracts previously sold.

117.    At no time did Defendants inform Plaintiff that Defendants had virtually sucked out of NAVISS in a Ponzi scheme/ shell game virtually every single dollar that it made in 2010, 2011, 2012, 2013, 2014 and 2015 through distributions and loans to NAVISS Principals (Logomasini, Chrisco, Simpson, and GR3/Podhorn) such that NAVISS was insolvent and any transfer made to NAVISS OWNERS/Insiders constituted fraudulent transfers with the intent to avoid and defraud creditors.

118.    Additionally, the Marketing Advances were almost immediately funneled from the NAVISS Defendants' bank accounts with U.S. Bank to GR3/Podhorn. The $250,000 Marketing Advance was immediately wired from the NAVISS Defendants' bank accounts to GR3 Construction on October 17 just minutes after being received. An additional $100,000 was wired in two $50,000 transfers from the NAVISS Defendants to GR3 Construction on December 18 and December 24, just two days following a $100,000 transfer from Plaintiff EFG to the NAVISS Defendants pursuant to the $400,000 Marketing Advance.

119.    Upon information and belief, Defendants failed to maintain holdback reserves as required under the Relevant Contracts to refund the fees of Defendants' pro rata share of the fees that they earned on the sale of vehicle service contracts which later were cancelled by customers.

As a result, unbeknownst to EFG, NAVISS was insolvent each year between 2010 and 2014 and Plaintiff EFG became responsible to not only pay its share of the refunds, but also NAVISS's share of the cancellation refunds.

120.   By distributing to the Individual Defendants and their affiliated entities the Reserves, the Marketing Advances, the Advanced Commissions, and all loan proceeds and denuding the NAVISS Defendants for Logomasini, Chrisco, Simpson, and GR3/Podhorn's personal gain through loans, distributions lines of credit and purchases of property, each of the NAVISS Defendants were insolvent as defined by § 24.003 of the Texas Business and Commerce Code (the "TBOC") and RSMo. § 428.014 because, each in the alternative:

> A. the sum of each of the NAVISS Defendants' debts, including, without limitation, the Reserves and the Marketing Advances, was greater than their assets; or
>
> B. each of the NAVISS Defendants were generally not paying their debts including, without limitation, the Reserves and the Marketing Advances, as they became due.

121.   The NAVISS Defendants' assets were transferred, concealed, or removed with intent to hinder, delay, or defraud Plaintiff EFG and other creditors or had been transferred in a manner making additional transfers voidable under MO. 428.024.1(1) and under Chapter 24 of the TBOC. *See* §24.003(d) of the TBOC.

122.   Under § 24.005(a) of the TBOC and RSMo. § 428.024.1, as to the Marketing Advances, the Advanced Commissions, and any loan proceeds, any transfer from 2011 forward to fund the purchase of properties and/or construction projects or any retention by Logomasini, Chrisco, Podhorn, or any of their affiliates, including, without limitation, the remaining Defendants, was fraudulent as to Plaintiff EFG because such Defendants and affiliates made such transfers or retention with actual intent to hinder, delay, or defraud any creditor of the debtor.

123.    Under § 24.005(b) of the TBOC and RSMo. § 428.024.1(2) and RSMo. § 428.029.1, as to the Marketing Advances, the Advanced Commissions, and any loan proceeds, any transfer from 2011 forward to fund the purchase of properties and/or construction projects or any retention by Logomasini, Chrisco, Podhorn, or any of their affiliates, including, without limitation, the remaining Defendants, was fraudulent as to Plaintiff EFG because such Defendants and affiliates made such transfers or retention without receiving a reasonably equivalent value (as defined by § 24.004(d) of the TBOC and RSMo. § 428.019) in exchange for the transfer or obligation and Defendants:

    A.  had remaining assets which were unreasonably small in relation to the loan; and

    B.  intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

124.    Defendants intended to defraud Plaintiff EFG, because, *inter alia*:

    i.  the transfer or obligation was to an insider;

    ii.  the debtor retained possession or control of the property transferred after the transfer;

    iii.  the transfer or obligation was concealed;

    iv.  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    v.  the transfer was of substantially all the debtor's assets;

    vi.  the debtor absconded;

    vii.  the debtor removed or concealed assets;

    viii.  the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

34

ix. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

x. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

xi. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

125. Under § 24.006 of the TBOC and RSMo. § 428.029, the Marketing Advances and the Advanced Commissions and the monies used to fund the purchase of the real estate properties and construction projects by the Individual Defendants and their affiliates were fraudulently incurred by, and then the proceeds of same fraudulently transferred from, the NAVISS Defendants to Logomasini, Chrisco, Simpson, GR3/Podhorn, and/or any affiliates of Defendants, because, *inter alia*:

A. the NAVISS Defendants were insolvent at the time or became insolvent as a result of the transfer;

B. the NAVISS Defendants did not receive a reasonably equivalent value in exchange for the transfer or obligation; and

C. Logomasini, Chrisco, GR3 Construction, and/or Podhorn were insiders and such insiders had reasonable cause to believe that the debtor was insolvent.

126. Under § 24.008 of the TBOC and RSMO. § 428.029, Plaintiff EFG requests as a result of Defendants' fraudulent transfers:

A. avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

B. an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or

C. subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

35

i.   appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

ii.   any other relief the circumstances may require.

127.   The Texas Uniform Fraudulent Transfer Act (Chapter 24 of the TBOC) and the Missouri Uniform Fraudulent Transfer Act (RSMo. § 428.024) are virtually the same. Therefore, any fraudulent acts referenced above would constitute fraudulent transfer under Texas law or Missouri law.

128.   The remaining Defendants (all Defendants but NAVISS and the Individual Defendants) are liable for NAVISS's and the Individual Defendants' fraudulent transfers as explained in Paragraphs 115-1**Error! Reference source not found.** herein, *supra*.

129.   As a direct and proximate result of these wrongful acts, Plaintiff suffered injury. Therefore, Plaintiff seeks to recover both actual and exemplary damages.

## PRAYER

WHEREFORE, Plaintiff prays that judgment be entered for Plaintiff against Defendants for actual and exemplary damages in an amount to be proven at trial, prejudgment and post-judgment interest, reasonable attorney's fees and costs, and any other relief the court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims alleged herein.

Respectfully submitted,

ELIAS GUTZLER SPICER LLC

/s/ Tamara M. Spicer
Richard M. Elias, #118567
Tamara M. Spicer, #54037MO
1924 Chouteau Ave., Ste. W
Saint Louis, MO 63103
(314) 833-6645 - Main
Emails: relias@egslitigation.com
        tspicer@egslitigation.com

SHIELDS LEGAL GROUP

James D. Shields (*pro hac vice* motion to be filed)
Bart Higgins (*pro hac vice* motion to be filed)
David A. Shields (*pro hac vice* motion to be filed)
16301 Quorum Drive, Suite 250B
Addison, Texas 75001
(972) 788-2040 -Main
(972) 788-4332 –Facsimile
Email: jshields@shieldslegal.com
        bhiggins@shieldslegal.com
        dshields@shieldslegal.com

ATTORNEYS FOR PLAINTIFF ENTERPRISE
FINANCIAL GROUP, INC.