UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ENTERPRISE FINANCIAL GROUP, INC., )
                                                   )
    Plaintiff,                       )
                                                   )
v.                                                )         No. 4:16CV1619 HEA
                                                  )
RICHARD PODHORN, et al.,      )
                                                 )
    Defendants,          )

## **OPINION, MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Motion to Dismiss, [Doc. No. 18]. Plaintiff opposes the Motion. For the reasons set forth below, the Motion is granted.

### **Facts and Background[1]**

Plaintiff was founded more than 37 years ago by an established and nationally recognized auto dealer, Robert W. Moore. Plaintiff administers a broad array of insurance-like consumer protection products, including extended vehicle service contracts, vehicle return programs, paint-less dent repair coverage, tire and wheel programs, and home warranties. Plaintiff sells its products in forty-nine (49) states through several distribution models: vehicle dealerships, Original Equipment

---

[1] The recitation of the facts is taken from Plaintiff's Amended Complaint and is set forth for the purposes of this motion only. It in no way relieves the parties of the necessary proof of the facts in later proceedings.

Manufacturers ("OEMs") and lenders, and direct-to consumers through independent call centers.

One entity that sold Plaintiff products was North American Vehicle Insurance Services LLC, also known as "NAVISS." NAVISS was originally formed and owned by Clayton Logomasini, Jason Chrisco, David Simpson, and Defendants GR3 and Podhorn.  GR3 and Podhorn are Seventy-Nine point Eight Five percent (79.85%) owners of NAVISS, as reflected in NAVISS tax returns for 2011.

In 2012 and 2013, NAVISS was a successful Seller of Plaintiff's traditional vehicle service contracts ("VSCs"). In 2013, NAVISS produced just over 10,000 gross traditional VSCs.

Between 2010 and 2015, unbeknownst to Plaintiff, Logomasini, Chrisco, Simpson, and Defendants Podhorn, GR3, and the other Defendants participated in a fraudulent, concealed shell game/Ponzi scheme whereby they used a web of companies which were undercapitalized at the time of their formation to transfer funds from one company to another, reaping the financial benefits for themselves or their affiliates; to denude the coffers of these insolvent companies; and to close the doors of those companies to make it extremely difficult for Defendants' creditors to recover monies that the Defendants secretly absconded with. As a part of Defendants' plan, Defendants took on as much debt as possible to line their

pockets with more cash to fund their personal obligations and ongoing real estate projects. Defendants used these borrowed moneys, debt proceeds, and newly-lined pockets to cover debts and obligations of these personal obligations and real estate projects. Defendants transferred cash and accounting records from company to company in order to conceal their scheme, often using the cash and receivables as collateral to take on more debt and two sets of accounting records to disguise this from creditors and potential lenders.

Plaintiff has sued NAVISS, Logomasini, Chrisco, and Simpson in Texas state court, in a case styled *Enterprise Financial Group, Inc. v. NAVISS, et al.*, Cause No. DC-15-00973, pending before the 44th Judicial District Court of Dallas County, Texas, the Honorable Judge Bonnie Lee Goldstein (the "Texas Action").

The various entities involved in this case, including the Corporate Defendants owned and controlled by Logomasini, Chrisco, Simpson, and Defendant Podhorn ("Individual Owners") are shell entities used solely as cover to further the fraudulent enterprise. Thus, under Missouri law, the corporate form of the Corporate Defendants should be disregarded and pierced and the Defendants Podhorn, Logomasini, Chrisco and Simpson should be found liable for the debts of the Corporate Defendants for the following reasons:

> A. the Individual Owners, jointly or individually, controlled the Corporate Defendants, not by mere majority or complete stock control, but with complete domination, not only of finances, but of policy and business practices in respect to the transactions at issue in this litigation so that the

corporate entities as to the transactions had at the time no separate mind, will or existence of their own;

B. the Individual Owners, through some or all of the Corporate Defendants, used their control of the Corporate Defendants to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty or dishonest or unjust act in contravention of Plaintiff's legal rights;

C. the control of the Corporate Defendants and the breach of their legal duties proximately caused Plaintiff injury and an unjust loss;

D. The Individual Owners used a web of companies as a sham to perpetuate fraud;

E. The Individual Owners used the companies in their scheme as a device to defraud creditors by transferring assets of NAVISS, GR3, and other affiliated companies from one corporation to another or to the Individual Owners when the corporations are owned by the same persons or entities;

F. The Individual Owners used a web of companies and its form to evade existing legal obligations to pay creditors and invade taxes;

G. The Individual Owners used a web of companies and its form to make transfers to benefit themselves in the form of distributions and loans which were fraudulent under the Missouri Uniform Fraudulent Transfer Act;

H. The Individual Owners stripped the assets of the Corporate Defendants to avoid and defraud creditors and Missouri residents;

I. The Individual Owners inadequately capitalized NAVISS and Defendant GR3, and the other Corporate Defendants, in their scheme at the time of incorporation and while these companies were in business by denuding the coffers of these companies through distributions and loans with the effect of keeping the companies' assets at a very small level in comparison to the known risks associated with the planned corporate enterprise; the Individual Owners made contractual promises without the present intent to perform which constituted misrepresentations sufficient to demonstrate fraud; and the Individual Owners caused their web of companies to be used for the purpose of perpetrating an actual fraud and perpetuated an actual fraud on Plaintiff primarily for the Individual Owners' direct personal benefit.

4

To conceal their cash addiction, the Individual Owners used additional strategies other than the multiple strategies set forth above, including, without limitation:

A. Keeping multiple sets of "books" and accounting records;

B. Changing entity names, frequently and without justification, sometimes simply swapping their personal initials;

C. Using a web of fraudulent loan transactions and partner distributions between themselves and their many entities in order to keep track of the "real" outstanding balance;

D. Making and accounting for "ownership distributions" to certain partners (including Defendants Podhorn and GR3), but removing or excluding those partners from the ownership or operating documents and paper trail; and

E. Making and entering into "cash allocation" agreements between Defendant Podhorn, Logomasini, Chrisco, and Simpson whereby they agreed that Defendants GR3 and Podhorn and/or other related entities, including the Corporate Defendants, would receive minimum guaranteed cash allocations from NAVISS, and Defendants GR3, APR, CLS, and the Individual Owners in exchange for "investment capital" and interests in other projects. In reality, Defendants GR3 and Podhorn were actually owners of NAVISS, but references to them being owners were excluded from any operating documents, state filings, or corporate records.

In order to fund their cash addiction, the Individual Owners utilized familiar concealment strategies in a never-ending cycle:

A. First, the Individual Owners would pledge cash in order to collateralize additional debt from different creditors. The multiple books, name changes, transfers of cash, and under-the-table distribution/allocation agreements helped them pledge cash accounts in exchange for quickly-made loans.

B. Second, once the Individual Owners received the proceeds of the loan (collateralized by cash), the Individual Owners would invest in a company or project (real estate projects, for example);

5

C. Third, after commencing (or continuing, in the case of a capital call) the company or real estate project, the Individual Owners would substitute their cash collateral pledge for the assets of the company or real estate project (receivables or real estate);

D. Fourth, the Individual Owners would transfer the cash to themselves or their affiliate entities and restart the process. In addition to the loans and ownership distributions, the Individual Owners withheld payment of customer cancellations so that their call center business would keep distributing cash to pay for their personal and affiliates' debts and obligations. For example, Logomasini instructed an accounting manager to not pay any customer cancellation/refund unless previous approved by Logomasini. The account manager felt uncomfortable with this practice and, to protect herself, she identified cancellations which she caused to be forwarded to Logomasini. They had been marked "STC," code for "Sent To Clayton."

As a part of their scheme, the Individual Owners entered into various loan agreements with finance companies, including, without limitation, Omnisure Group, LLC ("Omnisure"), TransNational Payments ("TransNational"), PayLink, Credit Cash, and U.S. Cash, to suck out as much money as they could. These loan agreements were done without Plaintiff's

knowledge or consent.

Relying upon the large amount of revenue from 2012, the Individual Owners convinced PayLink to only retain $75 per contract and to pay the Individual Owners a much larger commission up-front. The Individual Owners greatly increased the risk that someone would have to pay out-of-pocket to make customers whole according to their contracts. Because the Individual Owners went

6

out of business and refused to honor their contractual commitments, Plaintiff was left on the hook for all customer cancellation payments. This deceptive trade practice greatly increased Plaintiff's financial exposure to future customer cancellations. The Individual Owners' refusal and nonpayment have actually caused Plaintiff to pay customer cancellations in an amount in excess of $6,000,000. This reserve adjustment was done without Plaintiff's knowledge or consent.

Defendant Podhorn and the network of Corporate Defendants were involved in all of these actions. Defendants Podhorn and GR3 were not placed on NAVISS' or the Individual Owners' ownership statements to avoid disclosure of Defendant Podhorn's 2010 personal bankruptcy filing. This deception is consistent with the Individual Owners' fraudulent transfer practice of moving security or collateral pledged for a loan or a debt to another entity when they believed that litigation was oncoming.

The Individual Owners accomplished the transfer of funds by wire, check, or withdrawal from their many accounts to others, and accounted for them as loans or partnership distributions in order to avoid creditor and regulatory scrutiny and tax liability. As a part of this scheme, Defendants have held at least one account overseas. The Individual Owners took these actions knowingly, willfully, and fraudulently to fund their scheme. Logomasini learned these practices during his

time at U.S. Fidelis, before the lawsuits, investigation, judgments, and prison sentences for Fidelis owners/executives.

On March 10, 2009, the Individual Owners (including Defendant Podhorn) formed Global Coalition Services, Inc. ("Global") in the State of Missouri. Prior to its administrative dissolution, Global's primary business was to sell, underwrite, and administer motor vehicle extended service contracts or "vehicle protection plans" to cover the cost of maintenance and repairs to a vehicle beyond the manufacturer's warranty. The plan was to market the vehicle protection plans to customers throughout the United States (where not precluded from doing so) under the name "NAVISS."

In consideration for several investors' agreement to provide seed money and additional funding, Global provided such investors shares of stock in Global, including:

> A. Name: Jay Gill
> Promissory Note Dated: 12/4/09
> Principal: $100,000
> 12% Interest: $12,000
> Terms of Promissory Note: 12 Months
>
> B. Name: Thomas H. Schindler and Lisa M. Schindler
> Agreement Signed: 11/30/09
> Promissory Note Dated: 12/7/09
> Principal: $50,000
> 12% Interest: $6,000
> Total Due: $56,000

    Terms of Promissory Note: 12 Months

    C. Name: Parmeet S. Matharu
    Agreement Signed: 10/16/09
    Promissory Note Dated: 12/7/09
    Principal: $100,000
    12% Interest: $12,000
    Total Due: $112,000
    Terms of Promissory Note: 12 Months

    D. Name: Avion Solutions, Inc. (Gary and Chad Donald)
    Agreement Signed: 11/30/09
    Promissory Note: $100,000
    12% Interest: $12,000
    Total Due: $112,000
    Terms of Promissory Note: 12 Months

    E. Name: Thomas J. Klepzig
    Agreement Signed: 1/31/10
    Principal: $50,000
    12% Interest: $6,000
    Total Due: $56,000
    Terms of Promissory Note: 12 Months

    The total amount funded by the investors was $448,000. This amount was not repaid on the due dates.

    On August 9, 2009, Global registered the fictitious name North American Insurance Services (the acronym of which is NAVISS) with the State of Missouri (the "Global- NAVISS 1st Fictitious Name Filing").

    On November 10, 2009, Global registered the fictitious name North American Vehicle Insurance Service Specialists (the acronym of which is AVISS)

9

with the State of Missouri. Global was listed as the 100% owner of this name (the "Global-NAVISS 2nd Fictitious Name Filing").

On December 10, 2009, Simpson and Chrisco authorized and directed the formation and registration of a new Missouri limited liability company, North American Vehicle Service Specialists, taking the identical name registered, used, and owned by Global.  It was designed to perform the identical business of Global – to sell, underwrite, and administer extended vehicle service contracts under the name "NAVISS."

On February 6, 2010, Simpson and Chrisco authorized and directed the filing of an amendment to the Articles of Organization to change the name of North American Vehicle Insurance Service Specialists, LLC to NAVISS, LLC, taking the identical name registered, used and owned by Global. Simpson assured Gill and the other Global shareholders that as soon as NAVISS was wrapped up and off the ground, Simpson and/or NAVISS would make sure that Global shareholders retained the identical ownership interest in NAVISS that they had in Global.

Despite continuing to communicate with Gill periodically and act as if he was his partner and co-owner in NAVISS, and continuing to solicit Gill's business knowledge and advice with respect to same, Simpson failed to list or include Gill (or the other shareholder) as an owner of NAVISS. Further, Simpson, and NAVISS

distributed a significant portion of NAVISS' profits – profits that properly belonged to Global – to Simpson, Chrisco, and Logomasini, to the detriment and exclusion of Gill and the other Global shareholders. Simpson and NAVISS (and other members of NAVISS) have failed to provide Gill with any interest in NAVISS.

In March 2010, Simpson, as CEO of Global, transferred cash and funds from Global to NAVISS in the amount of at least $269,877.30 in the form of a loan, which was without collateral.

In October 2010, Simpson, acting as CEO of both companies, assigned Global's registered trademark "AND NOW YOU'RE COVERED" to NAVISS. The assignment of Global's trademark was made without the knowledge, consultation, or approval of Gill, Global's Board of Directors, or Global's shareholders (other than Simpson and Chrisco), and contained no consideration.

Simpson created Global's website for Global. The website was owned by Global and initially paid-for using Global funds. The website was designed to market the vehicle protection business. Simpson, as CEO for Global, transferred Global's website to NAVISS for no consideration.

The transfers of Global's trademark registrations, website, and over $269,000 in cash were not carried out in the ordinary course of Global's business and Board of Director approval was never secured.

NAVISS and its principals failed to pay back the original investors of Global when the outstanding promissory notes became due.

Defendants move to dismiss this matter for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1).

## Standard of Review

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be either a "facial" challenge based on the face of the pleadings, or a "factual" challenge, in which the court considers matters outside the pleadings. *See Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *Osborn v. United States*, 918 F.2d 724, 729, n. 6 (8th Cir. 1990); *C.S. ex rel. Scott v. Mo. State Bd. of Educ.*, 656 F. Supp. 2d 1007, 1011 (E.D. Mo. 2009). Here, Defendant's challenge is based on the face of the pleadings and is therefore a facial attack. In evaluating a facial attack, "the court restricts itself to the face of the pleadings and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 914 (8th Cir. 2015) (quoting *Osborn,* 918 F.2d at 729 n. 6). The court must accept as true all of the factual allegations in the complaint, but it need not accept legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Article III, § 2 of the United States Constitution, federal jurisdiction is limited to "Cases" and "Controversies." U.S. Const. Art. III, § 2. "'One element

of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.' " *Clapper v. Amnesty Int'l U.S.A.*, 133 S. Ct. 1138, 1146 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The "irreducible constitutional minimum" of standing consists of three elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)). Where a case is at the pleading stage, the plaintiff must "clearly...allege facts demonstrating each element." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Defendants urge dismissal for lack of standing because Plaintiffs have not satisfied the pleading requirements to establish they have standing to bring this action. Plaintiffs currently have not established a breach of the alleged contracts involved in this matter. Indeed, the Amended Complaint alleges that Plaintiff has sued NAVISS, Logomasini, Chrisco, and Simpson in Texas state court, thus clearly establishing for the motion to dismiss analysis that a determination has not yet been made on Plaintiff's claims. Because of this, Defendants argue that Plaintiff has failed to satisfy the concrete injury element of standing juris prudence.

13

> The Eighth Circuit Court of Appeals has recognized that
>
> "a threatened injury must be certainly impending to constitute injury in fact," and that "allegations of future injury must be particular and concrete." *Johnson v. Missouri,* 142 F.3d 1087, 1089 (8th Cir.1998) (alterations and internal quotation marks omitted).

*Miller v. City of St. Paul*, 823 F.3d 503, 507-08 (8th Cir. 2016).

This action stems from Plaintiff's concern that, in transferring assets to Defendants, NAVISS has breached the agreements. Plaintiff does not know with certainty that this is the case because the Texas Court has not yet made a determination. Once the Texas Court renders an opinion, Plaintiff anticipates that Defendants will be responsible for the amounts it is owed from NAVISS based on the alleged fraudulent transfers.

The alleged injuries underlying these claims are hypothetical and conjectural. Hypothetically, the Texas Court could award Plaintiff a substantial judgment. However, it might turn out that the Texas Court will award Plaintiff nothing. This conjecturing demonstrates that Plaintiff can only speculate as to how the Texas Court will resolve the pending suit and what situation the parties will be in at that time. *Clapper*, 568 U.S. 398, 410-14 (holding that a "speculative chain of possibilities" did not establish imminent concrete injury).

How the Texas Court will ultimately rule is presently unknowable. Therefore, Plaintiff lacks a concrete actual or imminent injury at this time.

Because Plaintiff has failed allege a threatened injury that is certainly impending and that any future injury is particular and concrete, Plaintiff has failed to sufficiently establish standing to challenge bring this suit at this time against these Defendants; the lawsuit is premature.

Plaintiff argues that the Missouri statute allows for the commencement of a fraudulent transfer action even if a judgment has not yet been rendered finding a creditor/debtor status. A "creditor" is a "person who has a claim," and a "debtor" is a "person who is liable on a claim." Mo. Rev. Stat. § 428.009(4) & (6). A "claim" is "a right of payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecure." Mo. Rev. Stat. § 428.009(3).

While the Court recognizes that the Missouri statute defines a claim as a right of payment even if the right is not reduced to judgment, this Court is bound by the Constitutional requirement of standing in order to pursue the claim at this time. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547.

## Conclusion

Based upon the foregoing analysis, Defendants' Motion to Dismiss for lack of subject matter jurisdiction is well taken. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss, [Doc. No. 18] is granted.

15

**IT IS FURTHER ORDERED** that this matter is dismissed without prejudice.

Dated this 7th day of March, 2018.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE